and to address the claims that we won below on rebuttal. I'd like to spend the first half of my argument explaining why the regulatory scheme's differential treatment of abortion and all comparable medical procedures violates the Equal Protection Clause under even the lowest level of review that could be applied in this case, namely the rational basis test articulated in Romer v. Evans. To do so, I need to – It violates the Equal Protection Clause. Are you addressing the equal protection interest of the physicians or of the patients? We have asserted the – Or both? Both, Your Honor. We've asserted the equal protection interest of both. And right now in addressing why this classification violates the equal protection interest under the Romer rational basis test, that would apply to both the patients and providers. To do so, I'd like to quickly lay out four relevant facts. First, hundreds of surgical procedures are performed in Arizona, including abortions, in four different settings, hospitals, ambulatory surgical centers, outpatient clinics, and physician practices. The first three of those settings are all regulated by the State regardless of which procedures are performed in them. Until 1999, the State did not regulate physician practices at all. The regulatory scheme created an exception to that rule, regulating physician practices in which abortions are performed, yet leaving all other physician practices unregulated regardless of the procedures performed in them, the number or type of surgeries performed. Second, this regulatory scheme addresses generally applicable health themes that have no particular application to abortion over other surgical procedures and which are unrelated to the State's interest in potential life. Third, the undisputed evidence in the record demonstrates that abortion is comparable in every respect relevant to this scheme to numerous other procedures that are performed in unregulated physician practices in Arizona. Fourth, the undisputed evidence demonstrates that the scheme is not going to improve abortion safety. Instead, it's going to threaten the health of abortion patients. It is against this factual background that the Court must conduct its equal protection review, and in doing so, the Court must at a minimum apply the rational basis test, the more searching rational basis test that was articulated in Romer v. Evans and that applies when a law targets a politically unpopular group. The regulatory scheme does so. It only applies to women, along with their physicians, who are exercising their right to reproductive choice in a way that is disfavored by much of our society and by the State. It is very clear that abortion patients and abortion providers are particularly are a politically unpopular group in this country. Under Romer, this Court must determine whether the regulatory scheme is narrow enough in scope and grounded in sufficient factual context for the Court to ascertain some relation between the classification and the purpose it serves. Here, there is no such connection. The generalized health concerns that are addressed by the regulatory scheme are so broad and so widely applicable in comparison with the group targeted that the connection cannot possibly be deemed rational. It's not rational to single out abortion from comparable procedures for the imposition of health laws that are equally applicable to those other procedures. That's not rational.  The State asserts that the health of abortion patients and abortion providers If you want to undertake, you mean the legislature, some kind of reform or corrective action, you know, it's okay to attack it one at a time. You don't have to, you know, try to fix everything at once, right? That's correct, Your Honor. That is the test that applies for purely economic regulation. That's not the test that applies, whereas here you have a politically unpopular group exercising a constitutional right. Both under the fundamental right strand of equal protection and under the Romer rational basis review, you get something more than that most deferential of rational basis review, because it raises sort of under the Romer test, there's a suspicion of invidiousness raised where this first step that the State has chosen to take, in fact, the only step that the State has chosen to take, places a burden only on a politically unpopular group. So here you have to take that, undertake that more searching level of review, which requires some real fit between the classification that's being imposed, the breadth of the law that's at issue, the breadth of the interest addressed by the law at issue, and the justifications of the State. And here that fit is just lacking. Well, how do you fit in the, at least the highly publicized incident which apparently actuated the legislation, that there was a clinic and a death involved at the clinic, prominent accounts that there were substandard procedures used? At least that would give, it would be similar to perhaps, you might characterize them as overreactions, but legislative overreactions to media reports and other areas. Why isn't that rational? Even though from a medical viewpoint, it might not be ideal or equally applied. Your Honor, it wasn't irrational for the legislature to want to respond to Ms. Herron's death. The State did respond, I should mention. It has criminally convicted the doctor involved there, so there was a response. But it wasn't, it was rational for even this legislature, aside from any criminal response, to want to respond in some way. But the response that it undertook also had to be rational. And it wasn't so here. That death that occurred did not make abortion differently situated from other medical procedures in the State, as the record clearly demonstrates, the risks of abortion are comparable to the risks of many other procedures and patient deaths. I think what Judge Thomas is getting at is, but it could have given the intent to say, well, look, you know, this area, you know, obviously needs regulation. Right? And what's wrong with that? They say, okay, let's address this area and let's fix it up. And as I understand the record, they even had the cooperation of Planned Parenthood, right? They had the cooperation of one of the Planned Parenthood affiliates in the State. That's correct. Cooperation in the sense that that group gave some testimony, I believe, and gave some of its policies to the legislature. Let me give you another example. I mean, apart from the full field. In the mid-'70s, Congress banned PCBs. Now, they did so in response to a lot of highly publicized articles about PCB pollution problems. But I think most people can see that PCBs are probably less dangerous than a whole cast of other chemicals. And I think the argument could be made, just as that example, that that was irrational because if you really you're picking out a polluter, you're picking out a chemical that doesn't warrant it, but it was a legislative response to a highly publicized incident. What's different about this? Well, that's you're there into the one-step-at-a-time approach that's appropriate for economic legislation. This is not the proper setting for the one-step-at-a-time approach because you have a politically unpopular group here exercising a constitutional right.  And so it's not just a question of the importance of the law on that politically unpopular group. It needs to have some real rational connection between the classification that it has drawn and the breadth of the legislation and the problem being solved or being addressed. The problem being addressed here is complications from surgery, which are equally applicable in a wide range of settings. Given that the legislature had decided to carve out an exception from a longstanding policy of not regulation regulating a physician's offices, in deciding to do so, it needed to be rational in the group that it imposed the law on. And what the law imposed is not focused on abortion. It has nothing to do with the particularities of abortion. The law that it imposed addresses surgical safety generally in any physician practice. So if it's going to take that kind of law, it has to be rational in choosing who to apply to. And it is not rational to pick one surgery out of all the surgery performed in the entire state and to impose the law on them. The only thing rational about it is if what the state wants to do is disadvantage a group that it disfavors. Well, let me ask you, Ms. Jones, what evidence in the record is there that this has actually burdened the furnishing or the ability to get an abortion? There's significant evidence, Your Honor, of burdens. The burdens include threatening patient confidentiality, raising the cost of providing abortions, segregating. Okay, let's get to the cost. Can you tell me where or what the record shows about how much abortions would increase in cost and how many people would be dissuaded from getting an abortion at that price or anything like that? At this point, Your Honor, the record indicates that the cost of abortions will be increased by tens of thousands of dollars annually at each of the plaintiff providers. Is there any evidence about what the per-abortion price would be? No, there isn't yet. We have not yet calculated per-abortion costs, Your Honor. Well, I mean, suppose it only goes up, say, in abortion costs now. I'm just picking a number out of the air. Suppose it costs $500, and it would go up 10 percent to $550. Wouldn't you have some obligation to show through economic evidence or something that if the price goes up 10 percent that a significant number of people would be dissuaded, taking into account whatever additional safety benefits are achieved by the additional regulation? Well, I have two responses to that. One is that we have created a genuine issue of fact with respect to that matter because there is evidence in the record that price increases of the kind envisioned here do affect women. The second point is that ---- What evidence was that? There's expert testimony, Your Honor, of I believe two experts. I think it's Dr. Grimes and Dr. Henshaw. That says what? That says that price increases of the type envisioned here hinder some women from getting abortions and delay them until later in the pregnancy when the procedure is more dangerous. Second, Your Honor, what I would assert is ---- I think also, just on the same thing, I don't know if it's evidence or a threat, but some indication that some of the smaller practitioners might even go out of business. It's certainly possible. The evidence indicates that these kind of burdens when placed on abortion providers certainly discourage them from staying in the practice and raise their costs. The other point I'd like to quickly make is that when burdens are placed on abortion with no countervailing benefit whatsoever and, in fact, only threats to help, that in itself is an undue burden. As the Eighth Circuit said in Atchison, if all a law does is make abortion more difficult, that is an undue burden, regardless of how many specific women are going to be deterred by a specific cost. May I ask a quick question in terms of follow-up to Judge Silverman's question? I gather discovery is closed in this case, or has it not? It's closed. So when you're talking about you've not yet done the calculations ---- They could be calculated on the basis of what we have and given ---- But you're not asserting ---- And calculated by the experts we have. I'd like to reserve the rest of my time for rebuttal. That's fine, Mr. Jones. Thank you. Good morning. May it please the Court, I'm Denise Burke, Special Assistant Maricopa County Attorney, and I will be arguing for the Appelese Cross Appellants. Arizona, reacting to the tragic and preventable death of Luann Herron at a Phoenix abortion clinic passed common-sense regulations modeled on treatment protocols from Planned Parenthood and designed to ensure that women seeking to exercise their right to an abortion do not risk death or serious injury. The absence of Planned Parenthood in this case is significant, but what is more significant is the character of the regulations to which the plaintiffs object. And this is an example. Clinics must maintain clean, smoke-free, and vermin-free environments. Instruments must be sterilized. Patient medical histories must be taken before surgery. Properly trained personnel should monitor patient recovery. Well, there are a lot of other burdens than those two imposed. Why does it make any sense to impose those kind of burdens only on abortion providers and not on people who perform hysterectomies at surgery clinics? In this case, Your Honor, the State of Arizona acted rationally in response to the death of Luann Herron as the district... Go ahead. I understand your argument. Why does it make any sense to differentiate between those similar procedures performed at the surgery centers that are not affiliated with hospitals and clinics? Your Honor, as the Supreme Court has repeatedly recognized, abortion is a unique act, and that the social and psychological implications of abortion make it different from other medical procedures. You cannot simply focus in on the medical aspects of abortion. Isn't that what the regulation does? The regulation... And you're talking about... I'm sorry. No, I'm sorry, Your Honor. The regulation attempts to ensure that minimum health and safety regulations are in place in Arizona abortion clinics. But by saying that abortion is different, aren't you conceding the point that this is only directed at this because of the political and perhaps social aspects of this very contentious issue as opposed to the medical aspects? No, Your Honor. So explain to me why you think it's rational to not regulate hysterectomy sterilizations, similar type of procedures that are conducted just down the street in either a clinic or at an unregulated, lightly regulated surgical center, and these types of procedures. Why should there be a difference? Your Honor, as was noted before in the discussion of the equal protection argument, the state may take steps to regulate one procedure over another. And it was in this case that the situation, the circumstances that led to the death of Lou Anne Herron caused the legislature to act. And it's important to note in this case that the legislature did in fact rely on standards from abortion providers themselves in an attempt to make sure that abortion is safe in Arizona. There was no targeting, and there's no evidence in this case, that it was targeting or animus towards abortion providers. There was simply a desire to make sure that there are no more Lou Anne Herrons. So it is an appropriate function for the legislature to determine what types of medical procedures should be regulated. And that's what they did in this case, and their response was completely rational to the situation that occurred in the late 1990s in Arizona. Well, you did have one highly publicized incident, but of course there have a number of deaths at surgical centers all over the country on similar procedures. I mean, it happens. Yes, Your Honor. But that does not make the State's choice to regulate abortion irrational. Okay. I understand your position. Thank you, Your Honor. And turning to two aspects of the Regulatory Act where the district court erred. The district court erred in finding that the Regulatory Act violated providers' Fourth Amendment rights and that allowing government employees with a duty to maintain patient confidentiality, allowing these employees to access patient-identifying information, violated the informational privacy rights of those patients. And it is on those two points I'd like to focus the majority of my argument, reserving five minutes at the end, Your Honor. If you're not responding, if you're into your affirmative argument, may I ask you one question? Yes. Your brief didn't really, I didn't think, address the question of the alleged unconstitutional delegation of licensing. You responded to the due process argument, and I understand your argument. What is your response as to the unconstitutional delegation argument itself, leaving aside the due process questions? Your Honor, there was no improper or unconstitutional delegation in this case. In fact, if you look at what the regulation requires, which is admitting privileges for one physician at the facility during the time that the patient is there, there is no delegation of authority because the Department of Health Services maintains the right to license abortion clinics. And hospitals, as they always have, maintain the decision as to who they grant admitting privileges to. Right. But you can't have one without the other under this legislation. So, in fact, the hospitals have a veto power over this particular type of procedure, right? No, Your Honor, they do not. In the State of Arizona, a provider applying for admitting privileges is guaranteed both substantive and procedural due process. Right. And I understand your due process argument, and I take that. But the problem is, in the credentialing aspect itself, I mean, hospitals credential for a lot of different criteria that are different from licensure. For example, part of the requirements generally are that you have a certain amount of procedures done at that hospital for a year. You can't re-up at the hospital unless you use the hospital privileges. But in this unique area, generally speaking, these clinic providers aren't going to be using a hospital privilege. So, effectively, it seems to me, in most cases, you've delegated something that's reserved to the state to something that is essentially saying, you have to use our facility. I take some force from their delegation argument. I mean, there are a whole lot of credentialing decisions made by hospitals that are completely independent of the state licensure procedure. And then the problem is exacerbated because some hospitals, including, I think, the State University hospitals, prohibit abortions, right, except in emergencies. However, Your Honor, this is a facial challenge. And the plaintiffs bear the burden of showing that on its face, the Regulatory Act delegates in an unconstitutional manner some sort of authority. And in this case, they have not done that, Your Honor. The record reflects that all of the plaintiffs have admitting privileges, some at more than one hospital. But that's an as-applied challenge. It's the facial challenge. I mean, it cuts both ways on the facial challenge. Yes, Your Honor, and that is the correct response. If there is ever an issue as to whether admitting privileges have been improperly denied, the proper remedy is an as-applied challenge, not a facial challenge to a statute. Suppose the statute says that an abortion provider has to have medical liability insurance. What would you make of the argument, then, that the state has delegated to insurance companies who could not do abortions? Your Honor, my argument would be much the same. The fact is the plaintiffs bear the burden of showing that this is unconstitutional on its face. And the delegation of the alleged delegation of authority in this case is not unconstitutional in its face because the State of Arizona requires due process. Right. But a decision to credential somebody at a particular hospital may be based on a whole host of decisions, the reasons that have nothing to do with quality of medicine. For example, let's say that a hospital has a, which often occurs, a captive group of anesthesiologists that it uses. Those hospitals will not admit anesthesiologists who are qualified to practice at the hospital because they're prohibited from practicing at the hospital because of an exclusive contract relationship. They can't qualify. Therefore, under your logic, they wouldn't be able to practice medicine elsewhere. Now, the same situation applies to abortion providers because they'd only have to, well, I mean, I won't go into the details of it, but hospital credentialing is so different from state licensure that it seems to me that adding that requirement does amount to an improper delegation. Is Judge Thomas' assumptions about credentialing in Arizona in the record here? No, Your Honor. The record was developed as to the credentialing of the plaintiffs in this case and whether anyone was aware of any abortion providers being denied privileges, and no one was. You cannot predicate a facial challenge to a statute on assumptions or the worst possible case scenarios. I understand that. But you have to accept it for what it is. And if you're saying anybody, they can set any standards whatsoever, your only fallback is that there's a due process, they're entitled to a hearing. But it's entirely different. Well, they're entitled to both procedural and substantive due process. Ms. Burke, your time is half gone. I don't know how you structure it, but I'd like you to address, I assume, one of the issues you're interested in is the district court's Fourth Amendment ruling. Yes, Your Honor. And I'll simply reserve five minutes for rebuttal, so I'll use my remaining five minutes to address that issue if I may. All right. The district court was incorrect in finding that physicians' Fourth Amendment rights were violated. And I would like to point the Court to the case of New York v. Berger. And that case is controlling here. And it's important to note that both in Berger and a subsequent case upon which this Court ruled, Argent Chemical, both courts found that on the basis of one single comprehensive set of regulations, that a business was closely regulated and a warrant was not required to conduct compliance inspections. And that is exactly what we're addressing here, compliance inspections. And I would also note that there are 15 different types of medical facilities in Arizona that are currently subject to warrantless inspections. So this is bringing abortion underneath that umbrella into a commonly practiced area to ensure patient safety and to ensure compliance with standard medical practices. If you look at the Berger analysis very carefully, it's very instructive, Your Honor. The Berger court found that an industry was closely regulated in part when the state required licensing of that industry, just as they do here, when they required a display of a license, just as they do here, when they imposed civil and criminal penalties for violating a set of regulations, just as we do here. And the Court also noted that other states regulate using similar pieces of legislation. In this case, the record demonstrates that at least four other states have regulated abortion clinics similarly,  Berger set out a three-part analysis which the district court failed to properly apply for determining when an industry is or is not closely regulated. The first element is that there's a substantial government interest. And clearly there is a substantial government interest in ensuring the health and safety of women who enter abortion clinics. The second prong is that the warrantless inspections are needed to effectuate the purposes of the Regulatory Act. And in this case, it is needed for the state to ensure quality patient care and to ensure that abortion clinics are complying with the regulations. And thirdly, that there's a constitutionally adequate substitute for a warrant. And the Berger court went into great detail describing when this would occur. It noted that if the business owner knows that there will be periodic inspections and clearly the plaintiffs in this case know that there are going to be periodic inspections, that the statute defines the scope of the inspections and how to comply. The statute pervasively sets out the standards to be applied and how the abortion clinics can meet them. Do you think the statute here just describes or in some way limits the scope of the search? Your Honor, what the scope... It doesn't seem to. It seems to be limitless. As the Berger court noted, Your Honor, the scope, an appropriate time, place and scope restriction is in place when inspections are conducted during regular business hours. It's not so limited here, is it? Yeah, I believe it is, Your Honor. Tell me in the statute where it says that. The statute requires that the inspections be conducted... At any time? No, Your Honor, during regular business hours. Go ahead. That the statute specifies the types of clinics to be inspected and it tells what is going to be inspected, the premises, the records. It sufficiently lays out what will be inspected, when will be inspected and who will be inspected to meet the Supreme Court's analysis in Berger for a time, place and scope restriction. So given that, Your Honor, the Supreme Court's analysis in Berger is equally applicable here and the Fourth Amendment is not violated. And the second issue I'd like to address briefly is informational privacy. And I would point to this Court's decision in the Wall v. Planned Parenthood which was upholding the Arizona parental consent statute. And in that case, this Court found that access by state employees without disclosure did not violate patient informational privacy rights. And that's exactly what we have here. We have access to records with no disclosure because DHS has an affirmative duty to protect patient confidentiality. You mean no disclosure to the public, it's disclosed to DHS, right? Correct, Your Honor. But as this Court noted in the Wall, it is disclosure to the general public that is problematic, not disclosure to government employees with a duty to both protect patient health and maintain patient confidentiality. And if there are no further questions, I'll reserve my remaining time. Well, let me ask you this. What is to be gained by having the patient's information in the department, their personal medical information, as opposed to redacted statistical information? Isn't the mortality and morbidity rates the only thing you're interested in? No, Your Honor. I would point to the fact that the National Abortion Federation and their standards, which the plaintiffs point to as authoritative, the National Abortion Federation has said that complete and accurate medical records are important both to ensure quality patient care and to ensure a quality review of those services. And that is exactly what DHS is attempting to do, to ensure both quality care and to perform a review of those services to ensure that the clinics are complying with the provisions of the Regulatory Act that clearly are only intended to protect patient health and safety. And that's not required of any other medical procedure? Yes, Your Honor. In fact, there are 15 other types of medical facilities, including urgent care centers, outpatient surgical centers, that have this same sort of inspection routine in place. So this is not in any way singling out abortion for special treatment. Thank you. Okay. Thank you. I'm going to attempt to address Fourth Amendment and informational privacy in my remaining time. I'd first like to point out three of the many reasons why plaintiffs' practices are not closely regulated industries for Fourth Amendment purposes. First, those practices, unlike gun shops and junkyards and mines, are private offices of licensed professionals who provide confidential services to patients. No Federal court has ever held such a private office to be closely regulated. Second, the courts have only held industries to be closely regulated where participants have effectively consented to warrantless searches by entry into the industry. There is no possible fiction by which plaintiffs can be said to have consented to searches of their offices without a warrant by entering into the practice of medicine. It's a profession with a history of independence from closed state regulation, and it's a profession in which courts have consistently recognized a reasonable expectation of privacy on the part of physicians. Third, there is no urgent governmental need here that is served by warrantless searches. Unlike closely regulated industries, the practice of medicine is not inherently dangerous. It's not closely linked to criminal activity. And the matters that are regulated by this scheme do not require sudden immediate inspection to be detected. You know, if they're trying to see if these people are in compliance with the scheme, they're looking at who's on the staff, what are their qualifications, what procedures are in the manual, how's the physical facility set up. This is not the sort of thing that's going to magically disappear while they get a warrant. So plaintiffs' medical practices are not closely regulated. And even if they were, this scheme cannot meet the requirements of Berger, both because warrantless searches are clearly unnecessary and they fail to come up with any basis for why they need a warrantless search, except for the generic assertion that it's always more convenient not to have a warrant, which I would agree with, that it's probably always more convenient not to have a warrant, but that can't be enough to show urgent need. And second, the inspection scheme does not provide a constitutionally adequate substitute for a warrant in terms of limits on time, place and scope and limits on the discretion of the inspector. Survey inspections may be conducted whenever an inspector desires to conduct one, and investigatory inspections are triggered any time a violation is alleged, even by a third party, even anonymously, and regardless of the credibility. So long as the person alleges there is a violation at X facility, X facility can then be inspected. And in either case, there's no restriction on the scope, the frequency of the search, anything like that. So this is not an adequate substitute for a warrant. If the Court doesn't have questions, I'll turn to informational privacy. And I would like to make three points regarding that claim. First, the disclosure provisions of the scheme are nothing like recordkeeping or reporting requirements. Those are requirements where physicians give limited, non-identifying information about patients to the State so that the State can compile health data. The information under this scheme is not that. It is abortion patients' complete actual medical records, including identifying information, medical history, ultrasound charts. So the recordkeeping and reporting cases that have been cited by defendant are simply irrelevant. Second, the State has failed to meet its burden under Crawford of showing that its use of this patient's personal information is narrowly tailored to advancing a State interest, sorry, a legitimate State interest. They offer two inadequate justifications. To make sure the facilities are properly recording contact information of patients and to allow the State to track records through quality assurance and peer review activities, as well as to track patterns among patients. The first interest, to the extent that it's legitimate at all, cannot possibly be served by the scheme unless the State is planning to further violate patients' privacy by contacting them later to check that the information is correct. And the second interest could easily be served by allowing physicians to remove identifying information from charts and replace it with a chart number before allowing the State to review the charts. There's simply no reason why these charts need to be reviewed in unredacted form. Third, because the disclosures here are not narrowly tailored to a legitimate State interest, the defendant's lengthy discussions about the adequacy of its safeguards are simply irrelevant. The right to informational privacy protects against improper solicitation of personal information by the State, even absent public disclosures.  And if the State is not able to fulfill the measure that it seeks, as it does here, then the State cannot sustain its burden under Crawford, regardless of any safeguards it might have in place. So this clearly violates patients' rights to informational privacy. If there are no questions on informational privacy, I'll turn to delegation. Go ahead. I'd just like to quickly address the point that the defendants make, that we cannot sustain our burden on a facial challenge. That is, that the problem in improper delegation of legislative authority is in the delegation itself. It's in the very grant of the authority without proper restrictions so that it will be exercised in accordance with the limits imposed on the State. That is the problem. So the constitutional violation occurs. But in a sense, already, you know, there are restrictions already built. We're speaking of the staff requirement, right? The requirement that the physicians have hospital admitting privileges. Now, you know, but there are already existing limitations and procedures governing admission to staff rights. I have a physician. It's a, you know, well, well-defined area, isn't it? Are you – I'm not sure what you're referring to. If you're referring to the fact that, for example, physicians must be licensed by the State in order to practice abortions. I'm talking about hospital admission procedures. I'm sorry. The limitations on how hospitals decide whether to grant. There are limitations. That's correct, Your Honor. The problem is that those limitations wouldn't stop the problem here, which is that hospitals here could deny admitting privileges on the grounds of their opposition to abortion, on the grounds that they don't want abortions ever performed in their facility, which is a grounds that is reasonable in light of hospital policies, including State hospital policies, that no abortion be performed. That would make, Your Honor, pretty good as an applied challenge. How does that deal with a facial challenge? Well, as I was trying to indicate earlier, Your Honor, the problem in a standardless delegation is the delegation of itself, is that the court – sorry, the legislature has granted authority without proper constraints on it. As the Fifth Circuit said in Causeway, it's the discretion itself, the fact that discretion has been given where the State doesn't have discretion. Well, what would be, for instance, in your view, a sufficient restraint on the delegation to make it constitutional? What would the State have to do? Well, if, for example, if they require that the physicians have hospital admitting privileges, but they had some restraint on it so that hospital admitting privileges could only be granted or denied on the basis of the physician's qualifications as physician licensing is, then we'd be in a whole other area. But that's not the kind of constraint that is placed on hospital admitting privileges. Could they have a regulation that says doctors who do abortions have to be board certified? Would that be an improper delegation to the board? I don't believe so. I don't know that much about board certification. But I believe that board certification is granted only with respect to qualifications and that it couldn't be denied on the basis of something like opposition to abortion. Well, what evidence is there that a doctor who applies for board – I mean, for hospital admitting privileges could be excluded because of the hospital's opposition to abortion? What evidence is there of that? Well, it's actually a legal standard that the legal standards that are – the legal constraints that are placed on hospital admitting privileges in Arizona only require that the decision be not arbitrary and capricious and that it be in accordance with hospital policies. So a hospital policy may be to oppose abortion, certainly would be in a facility that doesn't want any abortions performed. Is there any evidence that any hospital has denied any doctor admitting privileges on that basis? No, there isn't, Your Honor, but there is evidence in the – or not evidence. There is legal evidence in the record that it is the policy of all state hospitals in Arizona not to permit abortions except in the case when a woman's life is in danger. I'd like to make just one rebuttal point on the equal protection argument that I gave earlier, which is that plaintiffs assert that on its face it is invidious discrimination to impose a broadly applicable law only on a politically unpopular group when that group is similarly situated to those not regulated. That on its face is irrational and discrimination and a denial of equal protection. Thank you. All right. Ms. Jones, thank you. Your Honors, I would like to briefly address some of the points made by counsel. The United States Supreme Court in its jurisprudence on the Fourth Amendment or on closely regulated businesses has never limited and said that only certain types of industries can ever be considered closely regulated. You know, the example was given of auto manufacturers, that only industrial types of businesses can be closely regulated. Instead, the court in Berger set out a three-part test to be applied to any industry that is being considered closely regulated. In this case, the State would argue that when you go into an abortion clinic, your very health and your very life are potentially implicated by going into the abortion clinic. So that certainly makes it equally, if not more important, than some sort of industrial industry cited by the plaintiffs. And moving on to the informational privacy argument, plaintiffs assert that the State has not narrowly tailored its access to the records in order to balance the State's need for access with the patient's right to privacy. And that is simply incorrect. The regulation does properly balance access with patient confidentiality. It does not allow access at any time that an inspector chooses to access those records. Records may only be accessed during specified inspections, licensure inspections, relicensure inspections, and a complaint investigation. When a complaint that reasonably alleges a violation of the Regulatory Act has been made. This is not broad sweeping authority to look at patient records. The Act indicates what needs to be in the record and what is important to be in the record, both to ensure patient privacy and to allow DHS to do its job to ensure that patients receive quality medical care. Why do you need the patient's name and address to do that? Well, one obvious reason would be to ensure compliance with the Act, because the Act requires that those things be in the patient record. But the testimony was also elicited in this case from the head of the inspection unit at DHS, that they use patient names at times to track records, to track certain patients, to look for trends in health care, and that would be equally important with the Regulatory Act, Your Honor. You can do that with an ID number that they're given. Why do you need the name? I don't understand that. I mean, the hospital, as a matter of hospital records, if people are identified with a number as well as a name, why do you need the name? I mean, this is not a new industry. Recordkeeping in the medical arena, recordkeeping requirements are well-established. Tracking morbidity, mortality rates for quality assurance is well-established. There are procedures from the Joint Commission and others. They're well-established. This is different. This is the only procedure I've seen where a patient name is required to be tracked by the state. No, it's not, Your Honor. In the state of Arizona, 15 types of health care facilities are licensed, and their records are reviewed. Unredacted patient records are reviewed. Well, there's a difference in this, but I'll let you finish your argument. I see that I am out of time, Your Honor. Thank you. Okay. We thank both sides for the very fine argument. This case is then submitted for decision. Last case on today's calendar, so we will stand in adjournment at this time. Thanks.
judges: Tashima, Thomas, Silverman